UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------

STEPHEN BUSHANSKY, Individually and on
Behalf of All Others Similarly Situated,

              Plaintiff,

      v.

CONTROL4 CORPORATION, MARTIN
PLAEHN, MARIA THOMAS, ROB BORN,
JAMES CAUDILL, DAVID C. HABIGER,
JEREMY JAECH, MARK JENSEN, and PHIL
MOLYNEUX,

              Defendants.

---------------------------------------------------------

Case No._____

**CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS**

**JURY TRIAL DEMANDED**

       Plaintiff Stephen Bushansky ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE AND SUMMARY OF THE ACTION**

       1.     This is a stockholder class action brought by Plaintiff on behalf of himself and all other public stockholders of Control4 Corporation ("Control4" or the "Company") against Control4 and the members of Control4's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which Control4 will be acquired by Wirepath Home Systems, LLC

("Parent" or "SnapAV") through its wholly owned subsidiary Copper Merger Sub Inc. ("Merger Sub") (the "Proposed Transaction").

2.      On May 9, 2019, Control4 and SnapAV issued a joint press release announcing they had entered into an Agreement and Plan of Merger dated May 8, 2019 (the "Merger Agreement") to sell Control4 to SnapAV.  Under the terms of the Merger Agreement, each Control4 stockholder will receive $23.91 in cash for each share of Control4 common stock they own (the "Merger Consideration").  The Proposed Transaction is valued at approximately $680 million.

3.      On June 21, 2019, Control4 filed a Definitive Proxy Statement on Schedule 14A (the "Proxy Statement") with the SEC.  The Proxy Statement, which recommends that Control4 stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) the Company's financial projections; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by the Company's financial advisor, Raymond James & Associates, Inc. ("Raymond James"); and (iii) the background of  the Proposed Transaction.  The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as Control4 stockholders need such information in order to make a fully informed decision whether to vote in favor of the Proposed Transaction or seek appraisal.

4.      In short, unless remedied, Control4's public stockholders will be forced to make a voting or appraisal decision on the Proposed Transaction without full disclosure of all material information concerning the Proposed Transaction being provided to them.  Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6.     This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because defendants are found or are inhabitants or transact business in this District.  Control4's common stock trades on the NASDAQ Global Select Market, which is headquartered in this District, rendering venue in this District appropriate.

## THE PARTIES

8.     Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Control4.

9.     Defendant Control4 is a Delaware corporation, with its principal executive offices located at 11734 S. Election Road, Salt Lake City, Utah 84020.  The Company is a leading provider of personalized automation and control solutions, enabling consumers to control virtually any device in a home or business automatically.  Control4's common stock trades on the NASDAQ Global Select Market under the ticker symbol "CTRL."

10.     Defendant Martin Plaehn ("Plaehn") has served as President, Chief Executive

Officer ("CEO") and a director of the Company since September 2011, and as Chairman of the Board since January 2014.

11.     Defendant Maria Thomas ("Thomas") has been a director of the Company since February 2018.

12.     Defendant Rob Born ("Born") has been a director of the Company since June 2011.

13.     Defendant James Caudill ("Caudill") has been a director of the Company since October 2014.

14.     Defendant David C. Habiger ("Habiger") has been a director of the Company since September 2012 and its Lead Independent Director since July 2015.

15.     Defendant Jeremy Jaech ("Jaech") has been a director of the Company since May 2014.

16.     Defendant Mark Jensen ("Jensen") has been a director of the Company since April 2015.

17.     Defendant Phil Molyneux ("Molyneux") has been a director of the Company since April 2015.

18.     Defendants identified in paragraphs 10-17 are referred to herein as the "Board" or the "Individual Defendants."

**OTHER RELEVANT ENTITIES**

19.     SnapAV, established in 2005, is a manufacturer and primary source of more than 2,700 installation-friendly audio, video, networking, power and surveillance products for residential and commercial A/V integrators.  SnapAV's principal executive offices are located at 1800 Continental Boulevard, Suite 200, Charlotte, North Carolina 28273.

20. Merger Sub is a Delaware corporation and wholly owned subsidiary of SnapAV.

21. Hellman & Friedman LLC ("H&F"), founded in 1984, is a leading private equity investment firm with offices in San Francisco, New York, and London.  H&F acquired Parent in 2017, becoming Parent's majority shareholder.  H&F's headquarters are located at 415 Mission Street, Suite 5700, San Francisco, California 94105.

## CLASS ACTION ALLEGATIONS

22. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Control4 common stock (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

23. Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

24. The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of June 12, 2019, there were 26,799,355 shares of Company common stock issued and outstanding. All members of the Class may be identified from records maintained by Control4 or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

25. Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

a)      Whether defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

b)      Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

c)      Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

26.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

27.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.   Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

28.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

**SUBSTANTIVE ALLEGATIONS**

**Background of the Company**

29.     Founded in 2003, Control4 is a leading provider of professionally installed smart home and business solutions enabling consumers to integrate audio, video, lighting, temperature, security, communications, network management and other functionalities into a unified automation solution, customized to match their lifestyles and business needs.   As of December 31, 2018, Control4 has automated more than 385,000 homes and businesses.   Control4 sells and delivers its solutions through a network of over 5,480 active direct dealers and 43 distributors

and have solutions installed in 106 countries.

30.    The Company's Control4 product line includes the Control4 home operating system and the associated application software, and software development kits ("SDK").  The Company's software components include Director for monitoring and receiving events; Home Control Interface for operating system displays graphical user interfaces including on televisions, in-wall and table-top touch panels, smartphones, and tablets; and Composer, a software application that enables trained and certified independent Control4 dealers and installers to design, configure, and personalize a Control4 home automation system for consumers.  Its software components also comprise Control4 Drivers, as well as DriverWorks SDK, a SDK to develop and test custom two-way interface drivers to support the integration of a new device or device model into system, or to customize and enhance an existing driver; I/O servers; and 4Sight, a subscription service that enables end customers to remotely access, monitor, and adjust settings in their homes and receive event-based email alerts from their system.  In addition, the Company offers products and services with embedded software, such as Controllers, Interface Devices, Networking Devices, Audio Solutions, Video Solutions, Lighting Products, Comfort Products, Security Products and Communication Products lines.

31.    Control4 has recently generated strong financial results, growing year over year.  For example, Control4 reported revenue of $272.5 million, $244.2 million and $208.1 million in 2018, 2017 and 2016, respectively, and net income of $43.8 million, $15.5 million and $12.3 million in 2018, 2017 and 2016, respectively.

32.    On November 1, 2018, Control4 reported its financial results for the third quarter of 2018.  For the quarter, Control4 reported revenue of $71.6 million, compared to revenue of $64.6 million for the third quarter of 2017, an increase of 11%.  Net income was $5.7 million, or

$0.21 per diluted share, compared to net income of $5.0 million, or $0.19 per diluted share, in the third quarter of 2017.   Control4 also added 149 authorized Control4 automation dealers worldwide, including 90 in North America, which was the Company's strongest expansion in North America since the first quarter of 2017.

33.    On February 4, 2019, Contorl4 issued a press release announcing its financial results for the fourth quarter and year ended 2018.  For the quarter, Control4 reported revenue of $72.5 million, compared to revenue of $68.1 million for the fourth quarter of 2017, an increase of 6%.   Net income for the quarter increased to $30.5 million, or $1.11 per diluted share, compared to net income of $5.9 million, or $0.21 per diluted share, in the fourth quarter of 2017. Mark Novakovich, Control4's Chief Financial Officer, commented on the Company's 2018 year ended financial results saying that the "[Company] delivered record results for 2018, including revenue and net income. . . delivering on our commitment to achieve sustainable, profitable growth to enhance long-term shareholder value."

34.    On May 9, 2019, Control4 issued a press release reporting its financial results for the first quarter of 2019.  For the quarter, Control4 reported revenue of $60.4 million, compared to revenue of $59.1 million for the first quarter of 2018.

**The Sale Process**

35.    On January 8, 2019, defendant Plaehn met with John Heyman ("Heyman"), CEO of Parent, and discussed, among other things, Parent's and H&F's interest in a potential strategic transaction with Control4.

36.    A few weeks later on February 6, 2019, the Company and Parent entered into a mutual confidentiality agreement.  Thereafter, Parent and H&F engaged in due diligence.

37.    Also on February 6, 2019, a company in the residential and commercial

automation industry referred to in the Proxy Statement as "Party A," met with defendant Plaehn and discussed Party A's interest in a strategic transaction with the Company.  An existing mutual confidentiality agreement was in effect between the Company and Party A due to previous discussions in 2016.  At the meeting, Party A indicated that it would not be able to make a proposal for the Company before the third quarter of 2019.

38.     On March 12, 2019, Parent delivered a written non-binding proposal to acquire the Company within a range of $23.00 to $25.00 per share in cash (the "March 12 Proposal"). The range was given based on the Company's capitalization as reported in its Form 10-K for the year ended December 31, 2018.  The March 12 Proposal indicated that Parent believed the parties would be in a position to sign a definitive merger agreement prior to the Company's May 2, 2019 scheduled first quarter earnings call.

39.     On March 14, 2019, the Board convened a meeting to discuss, among other things, Parent's March 12 Proposal.  The Board discussed possible sale strategies, including negotiating a definitive agreement with Parent subject to a "go-shop period."  The Board further discussed the impact of Parent's proposal to proceed expeditiously, and noted, among other things, the difficulty of conducting a meaningful pre-singing market check under such time constraints.  The Board also established a special transaction committee (the "Transaction Committee") comprised of defendants Habiger, Jensen and Caudill.  Over the next few days, the Company discussed potential terms of the agreement with Parent and H&F and affirmed to Parent its interest in pursuing a potential combination.

40.     On March 18, 2019, a financial sponsor referred to in the Proxy Statement as "Party B," on an unsolicited basis, expressed an interest in exploring a strategic transaction with the Company.  Party B and the Company entered into a confidentiality agreement on April 5,

2019.

41.     On April 10, 2019, the Board met and discussed, among other things, the Company's financial projections for fiscal years ended December 31, 2019 through December 31, 2023 (the "April Control4 Projections"). The Board approved the April Control4 Projections to be disclosed to prospective bidders and for Raymond James, the Company's financial advisor, to use in its financial analyses. Later that day, H&F contacted Raymond James and verbally indicated a revised offer price of $21.50. H&F indicated that the price reduction was based on, among other things, the Company's reduced April Control4 Projections. On that same day, Heyman conveyed Parent's revised offer price of $21.50 to defendant Plaehn. Defendant Plaehn indicated to Heyman that the Company would not consider such a transaction price.

42.     On April 15, 2019, Party A reaffirmed its interest to pursue a strategic transaction with the Company but indicated it was still unable to discuss a transaction until the third quarter of 2019. Similarly, Party B reaffirmed its interest in pursuing a strategic transaction with the Company and arranged a meeting for April 26, 2019, between itself and Raymond James to discuss further information regarding the Company.

43.     On April 18, 2019, Parent delivered a revised non-binding proposal to acquire the Company for $23.50 per share. The proposal indicated H&F and Parent expected to create a new equity compensation program for continuing employees, provide employees the opportunity to invest in the combined company following closing and that compensation packages for Company executives would be discussed upon approval of the Board. The Board met the next day and determined to proceed to negotiate a potential transaction with Parent and, as part of such agreement, pursue a go-shop process post-signing.

44.     Later on April 19, 2019, Parent and H&F indicated that they were willing to

improve their offer price to $24.00 per share in cash.    The Transaction Committee met to discuss the improved proposal and directed Raymond James to inform H&F the Transaction Committee was willing to move forward with negotiating and finalizing a definitive merger agreement based on Parent and H&F's $24.00 per share offer price.

45.    On April 22, 2019, a financial sponsor referred to in the Proxy Statement as "Party C," expressed an interest in exploring a potential transaction involving the Company and another company Party C was considering acquiring.  Raymond James subsequently informed Party C and Party B that the Company expected to reach an agreement for a strategic transaction with a third party in the next couple of weeks.  Party C and Party B each indicated that they were not interested in exploring a potential transaction with the Company under that timetable.

46.    On May 1, 2019, representatives of Parent held discussions with three of the Company's current executives (Jeff Dungan ("Dungan"), Senior Vice President, Supply Chain Operations and Business Development, Bryce Judd ("Judd"), Senior Vice President, Global Sales and Charles Kindel ("Kindel"), Senior Vice President, Products & Services (together, the "Rollover Employees")) regarding their willingness to enter into agreements concurrently with the execution of the merger agreement under which they would agree to invest a portion of their equity interests in the Company in exchange for equity interests of an indirect parent entity of Parent in lieu of receiving merger consideration in respect thereof.  The next day, on May 2, 2019, defendant Plaehn discussed with H&F the potential of defendant Plaehn joining the board of directors of the combined companies.

47.    Over May 7, 2019, H&F informed Raymond James that $24.00 per share price was subject to a downward adjustment to account for a larger number of fully diluted outstanding shares related to shares underlying restricted stock unit awards that were scheduled

to be granted in June 2019.  On May 8, 2019, H&F submitted a verbal revised proposal to acquire the Company for $23.91 per share in cash.  The proposal contemplated a 30-day go-shop.

48.     On May 8, 2019, Raymond James rendered its fairness opinion.  In connection with its analyses, Raymond James used the Company's April Control4 Projections as refined by the Company's management to incorporate, among other things, the Company's actual financial results for the first quarter of 2019 (the "May Control4 Projections").  Thereafter, the Board approved the Merger Agreement, which the parties executed later that day.

49.     Raymond James commenced the go-shop period on May 9, 2019 and it expired on June 7, 2019.  During the go-shop period, four parties entered into confidentiality agreements with Control4.   The Proxy Statement fails to disclose the terms of these confidentiality agreements, including whether they contain standstill provisions that are still in effect and operate to preclude any of these potential bidders from submitting a topping bid for the Company.

**The Proposed Transaction**

50.     On May 9, 2019, Control4 and SnapAV issued a joint press release announcing the Proposed Transaction, which states, in relevant part:

> CHARLOTTE, N.C. & SALT LAKE CITY--(BUSINESS WIRE)--May 9, 2019-- SnapAV, a leading manufacturer and primary source of A/V, surveillance, networking and remote management products for professional integrators, and Control4 Corporation (NASDAQ: CTRL) ("Control4"), a leading global provider of smart home solutions, today announced that they have entered into a definitive merger agreement (the "Agreement") whereby SnapAV will acquire Control4 in an all-cash transaction for $23.91 per share in cash, representing an aggregate value of approximately $680 million.
>
> This highly complementary combination will leverage the increased resources of the two companies to provide integrators with a true one-stop shop, offering a complete product portfolio of custom smart-home, control and automation solutions. Together, SnapAV and Control4 will drive increased innovation, simplified integration and compelling solutions that meet the demands of today's

- 12 -

expanding smart home industry. With leading technology solutions, a broad geographic footprint and exceptional service organizations, the combined company is poised to provide integrators with better opportunities to serve customers in the connected home and business markets.

Control4's Board of Directors has unanimously approved and recommended that stockholders vote in favor of the transaction. Under the terms of the Agreement, SnapAV will acquire all the outstanding common stock of Control4 for $23.91 per share in cash. The purchase price represents a premium of approximately 40% over Control4's closing price on May 8, 2019, the last trading day prior to execution of the Agreement, and a premium of approximately 38% over Control4's 30-trading day weighted average share price ended on May 8, 2019. Private equity investment firm Hellman & Friedman—SnapAV's majority shareholder since 2017—will invest additional equity as part of the transaction and be the majority shareholder of the combined company.

As award-winning industry leaders renowned for quality, service and continuous innovation, SnapAV and Control4 share a deep understanding of and commitment to the custom installation industry and are dedicated to making professional integrators more successful. By merging, SnapAV and Control4 will combine the talent of their collective 1,200+ employees, market-leading solutions, exceptional interoperability and channel platform, dealer-first programs, global distribution and financial resources to deliver value in ways no one else can—enabling integrators to serve their customers better and grow their businesses.

"We have pursued the mission of making our integrators' lives easier since SnapAV was founded," said John Heyman, chief executive officer of SnapAV. "Dealers will be able to buy leading solutions, access the best service technicians in the industry and experience simpler installation through purchasing, support and seamless product integration.

"Over the past several years, we have accomplished a number of goals we felt were critical to the success of integrators and the continued growth of SnapAV— including offering local delivery and pick-up through the acquisition of distribution sites around the country and expanding the suite of products available to support integrators. Merging with Control4 and its outstanding team will help us execute on our third critical goal: delivering the industry's leading automation platform that integrates with the numerous technologies and products required to create customized smart home experiences homeowners desire. Control4 offers a leading automation platform, along with key smart home solutions in the audio, video, lighting, security and networking categories. We are especially excited by the fact that both of our companies have similarly strong "customer first" corporate cultures centered on quality, service and innovation, and we look forward to creating new and exciting opportunities for the teams at both Control4 and SnapAV. In sum, the two companies will be better together, with better service, better solutions and better opportunities for integrators and employees."

- 13 -

"We believe today's announced transaction delivers compelling and immediate value to Control4 shareholders in the form of a significant share price premium, and we are excited to have the opportunity to join with the SnapAV team," said Martin Plaehn, chairman and chief executive officer of Control4. "Together with SnapAV, we will be able to invest even more in innovation, bring together and build upon the very best of our combined capabilities, and do so with improved reliability, responsiveness, security, and privacy for consumers. Today's announcement will enable us to better serve the expanding smart home market, making the lives of integrators easier and their businesses more effective and efficient."

Together the combined company will bring a deep understanding of the industry and an unmatched passion for providing best-in-class solutions and service with one objective: create better experiences for consumers and the integrators who serve them. Product integration, remote management, expert service technicians, product simplification, training and timely logistical capabilities will ensure every install is easier, more reliable and delivers fantastic experiences to consumers where they live and work.

"The combination of Control4 and SnapAV is transformative for the smart home industry," said Erik Ragatz, Partner at Hellman & Friedman and chairman of the Board of Directors of SnapAV. "The increased resources of the combined company will enable it to invest more to drive innovation and deliver best-in-class features, functionality and products. This combination will also allow us to support integrators more effectively than ever before in pursuit of our joint goal of bringing the promise of the connected home to life."

More than 1,200 employees of the combined company will be led by SnapAV CEO John Heyman and an executive team made up of leaders from both SnapAV and Control4. Control4 CEO Martin Plaehn will join the Board of Directors of the combined company, helping to ensure a smooth integration of the businesses. The merger reflects the value created by bringing together two industry-leading teams of employees who, united, can better serve the needs of the growing smart home segment. The company will share joint headquarters in Charlotte, North Carolina, and Salt Lake City, Utah, with offices and local facilities around the globe.

**Transaction Details**

As part of the Agreement, Control4's Board of Directors, with the assistance of its advisors, will conduct a 30-day "go-shop" process following the date of the execution of the definitive agreement, during which it will actively initiate, solicit, encourage and evaluate alternative acquisition proposals, and potentially enter into negotiations with any parties that offer an alternative acquisition proposal. Control4 will have the right to terminate the merger agreement to accept a superior proposal, subject to the terms and conditions of the merger agreement.

There can be no assurance that this "go-shop" will result in a superior proposal, and Control4 does not intend to disclose developments with respect to the solicitation process unless and until its Board of Directors makes a determination requiring further disclosure.

Subject to the go-shop, a special meeting of Control4's shareholders will be held as soon as practicable following the filing of the definitive proxy statement with the U.S. Securities and Exchange Commission ("SEC") and subsequent mailing to shareholders.

The transaction, which is expected to be completed in the second half of 2019, is subject to the satisfaction of customary closing conditions, including regulatory approvals and approval by Control4 shareholders.

**Insiders' Interests in the Proposed Transaction**

51.     Control4 insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.   The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Control4.

52.     Notably, certain Control4 insiders have secured employment for themselves upon consummation of the Proposed Transaction.   For example, in an Employee E-Mail from defendant Plaehn, dated and filed with the SEC on May 9, 2019[1], defendant Plaehn stated:

Upon closing of the transaction with SnapAV expected in the second half of 2019, the newly combined company will be led by John Heyman (SnapAV's CEO) and **an executive team made up of leaders from both SnapAV and Control4** with joint headquarters in Salt Lake City, Utah and Charlotte, North Carolina.  **I will join the Board of Directors of the combined company and will provide my contributions to our next chapters from that role and perspective.**

Emphasis added.

53.     Moreover, while Control4's stockholders are being cashed out and will lose the opportunity to benefit from Control4's current and future prospects, the Rollover Executives

---

[1]   Available   at:   https://www.sec.gov/Archives/edgar/data/1259515/000110465919028274/a19-9524_2defa14a.htm

have agreed to roll over portions of their equity positions in the Company.  Pursuant to their respective rollover agreements, Kindel, Judd and Dungan agreed to contribute a number of shares of Control 4 common stock and/or unvested Control4 restricted stock unit awards having an aggregate value equal to $400,000, $200,000 and $200,000, respectively, in exchange for Class A Nonvoting Units in Crackle Holdings, L.P. (the "Partnership").  The Rollover Executives' respective rollover agreements included term sheets outlining material terms of go-forward employment and other arrangements for each executive.

54.     Further, Control4's directors and executives stand to reap substantial financial benefits in connection with the accelerated vesting of certain Control4 equity awards.

55.     As set forth above, upon the closing of the Proposed Transaction, defendant Plaehn will no longer be the Company's CEO and "will join the board of directors of the general partner of the Partnership and will be available on an advisory basis to provide strategic advice and oversight from that director role."  Proxy Statement at 69.  As a result of his termination, defendant Plaehn stands to receive **_over $4 million_** in severance compensation.  In connection with his new advisory role, defendant Plaehn will also be entitled to an annual $75,000 cash retainer and an annual grant of restricted Class A Nonvoting Units in the Partnership with a fair market value of $100,000 on the date of grant.

56.     Moreover, in addition to the vesting of their equity awards, certain named executive officers will receive significant severance benefits in connection with the Proposed Transaction.  The following table summarizes the golden parachute compensation defendant Plaehn and certain named executive officers are entitled to receive upon consummation of the Proposed Transaction:

| Name | Cash ($)(1) | Equity ($)(2) | Perquisites/ Benefits ($)(3) | Total ($) |
|---|---|---|---|---|
| Martin Plaehn | $ 516,000 | $ 4,000,333 | $ 15,120 | $ 4,531,453 |
| Mark Novakovich | — | $ 2,036,176 | — | $ 2,036,176 |
| Susan Cashen | — | $ 1,066,003 | — | $ 1,066,003 |
| Bryce Judd | $ 315,000 | $ 1,667,848 | — | $ 1,982,848 |
| Charlie Kindel | $ 400,000 | $ 1,345,750 | — | $ 1,745,750 |
| Jeff Dungan(4) | $ 315,000 | $ 1,074,372 | | $ 1,389,372 |

## The Proxy Statement Contains Material Misstatements and Omissions

57.    The defendants filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to Control4's stockholders.    The Proxy Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote their shares in favor of the Proposed Transaction or seek appraisal.

58.    Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) the Company's financial projections; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by the Company's financial advisor, Raymond James; and (iii) the background process of the Proposed Transaction. Accordingly, Control4 stockholders are being asked to make a voting or appraisal decision in connection with the Proposed Transaction without all material information at their disposal.

### *Material Omissions Concerning Control4's Financial Projections*

59.    The Proxy Statement is materially deficient because it fails to disclose material information relating to the Company's intrinsic value and prospects going forward.

60.    Specifically, on April 10, 2019, the Board met and Company management presented its standalone plan which included management's April Control4 Projections for the fiscal years ended December 31, 2019 through December 31, 2023, and the underlying assumptions to the April Control4 Projections.    The Board approved the April Control4

Projections for disclosure to prospective bidders and for use in the financial analyses that Raymond James was preparing.

61.     Thereafter, at the May 8, 2019 Board meeting, Raymond James provided its financial analyses of the Company and the Merger Consideration.  In connection with these analyses, Raymond James used the May Control4 Projections, management's April Control4 Projections as refined and finalized by Company management following April 10, 2019 to incorporate, among other things, the Company's actual financial results for the first quarter of 2019.

62.     Notably, as shown in the tables below, the Unlevered Free Cash Flow ("UFCF") figures for the May Control4 Projections are approximately $11.2 million less than the UFCF figures for the April Control4 Projections.

*April Control4 Projections(1)*

|  | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Revenue | $ 288.9 | $ 316.6 | $ 348.6 | $ 384.9 | $ 424.0 |
| Adjusted EBITDA(2) | 41.6 | 48.5 | 59.0 | 69.8 | 80.6 |
| Non-GAAP Net Income | 33.1 | 37.7 | 44.8 | 53.1 | 61.7 |
| Non-GAAP EPS(3) | 1.18 | 1.32 | 1.55 | 1.80 | 2.06 |
| Unlevered Free Cash Flow(4) | 23.4 | 32.7 | 40.5 | 47.4 | 52.1 |

*May Control4 Projections(1)(2)*

|  | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Revenue | $ 289.0 | $ 316.6 | $ 348.6 | $ 384.9 | $ 424.0 |
| Adjusted EBITDA(3) | 41.7 | 48.4 | 59.2 | 70.2 | 81.3 |
| Non-GAAP Net Income(4) | 32.4 | 37.3 | 44.3 | 52.3 | 60.7 |
| Non-GAAP EPS(5) | 1.16 | 1.31 | 1.53 | 1.78 | 2.03 |
| Unlevered Free Cash Flow(6) | 28.0 | 28.9 | 36.3 | 43.0 | 48.7 |

63.     The Proxy Statement fails to disclose the assumptions underlying the May Control4 Projections and April Control4 Projections and the reason for the $11.2 million decrease in the UFCF figures for the May Control4 Projections.

64.     For purposes of its fairness opinion, Raymond James used the May Control4 Projections with the lowered UFCF figures.  Without the omitted material information set forth

above, Control4 stockholders are in the dark as to whether the Company's May Control4 Projections were artificially revised downward after the price had been agreed to with SnapAV, in order to fit the Merger Consideration into a range of fairness in Raymond James' financial analyses.

65.     As one highly-respected law professor explained, the forecasted free cash flows of a company is one of the three central components of a discounted cash flow analysis, "which can significantly affect the final valuation." Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006). As Professor Davidoff explains:

> [A] discounted cash flow analysis is conducted by discounting back at a chosen discount rate the projected future free cash flows and terminal value of an asset. In performing this analysis there are three central choices, which must be made, each of which can significantly affect the final valuation. *These are the correct forecasted free cash flows to utilize*, the appropriate discount rate, and the *terminal value* of the asset. *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value...This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices.* The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.

*Id.* at 1576-1577 (emphasis added).

66.     The omission of this information renders the statements in the "Certain Financial Projections Prepared by the Management of Control4" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Raymond James' Financial Analyses***

67.     The Proxy Statement describes Raymond James' fairness opinion and the various valuation analyses performed in support of its opinion.  However, the description of Raymond James' fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, Control4's public stockholders are

unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Raymond James' fairness opinion in determining whether to vote in favor of the Proposed Transaction or seek appraisal.  This omitted information, if disclosed, would significantly alter the total mix of information available to Control4's stockholders.

68.    With respect to Raymond James' *Discounted Cash Flow Analysis* ("DCF"), the Proxy Statement fails to disclose: (i) all line items used to calculate unlevered free cash flow; (ii) the terminal value of the Company; (iii) Raymond James' basis for applying exit multiples ranging from 10.0x to 13.0x and perpetual growth rates ranging from 3.0% to 5.0%; (iv) the net operating losses and research & development tax credits used by Raymond James in the analysis; (v) quantification of the inputs and assumptions underlying the discount rates ranging from 11.25% to 13.25%; and (vi) the number of diluted Company shares outstanding.

69.    With respect to Raymond James' *Selected Public Companies Analysis* and *Selected Transactions Analysis*, the Proxy Statement fails to disclose the individual multiples and financial metrics for each of the companies and transactions analyzed by Raymond James in the analyses.

70.    In addition, the Proxy Statement fails to disclose whether Raymond James reviewed with the Board equity research analyst price targets.  Notably, prior to the announcement of the Proposed Transaction, at least three analysts affirmed price targets well above the Merger Consideration.  Specifically, on May 6, 2019, a Cowen and Company, LLC. analyst affirmed a $27.50 per share price target; on May 2, 2019, a D.A. Davidson & Co. analyst affirmed a $33.00 per share price target; and on March 14, 2019, an analyst with Maxim Group LLC affirmed a $31.00 per share price target on the Company.

71.     When a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

72.     The omission of this information renders the statements in the "Opinion of Financial Advisor to the Company" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning the Background Process of the Proposed Transaction***

73.     The Proxy Statement omits material information relating to the background of the Proposed Transaction.

74.     In connection with the go-shop process, Control4 executed confidentiality agreements with four potential bidders.  The Proxy Statement fails, however, to disclose whether any of these confidentiality agreements contain standstill provisions that are still in effect and/or contain "don't ask, don't waive" standstill provisions that are presently precluding these parties from submitting a topping bid for the Company.

75.     The disclosure of the existence and terms of any confidentiality agreements Control4 entered into with any other party is crucial to Control4 stockholders being fully informed of whether their fiduciaries have put in place restrictive devices to foreclose a topping bid for the Company.

76.     The omission of this information renders the statements in the "Background of the Merger" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

77.     The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy

Statement.  Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed voting or appraisal decision in connection with the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

### COUNT I

**Against All Defendants for Violations of Section 14(a) of the
Exchange Act and Rule 14a-9 Promulgated Thereunder**

78.     Plaintiff repeats all previous allegations as if set forth in full.

79.     During the relevant period, defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

80.     By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy Statement.  The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants.  It misrepresented and/or omitted material facts, including material information about the Company's projections, the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by the Company's financial advisor and the background of the Proposed Transaction. The defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

81.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction or whether to seek to exercise their appraisal rights.

82.     By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

83.     Because of the false and misleading statements in the Proxy Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

84.     Plaintiff repeats all previous allegations as if set forth in full.

85.     The Individual Defendants acted as controlling persons of Control4 within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Control4, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

86.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

87.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy Statement at issue contains the

unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of the Proxy Statement.

88.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

89.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

90.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' conduct, Control4's stockholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Control4, and against defendants, as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until

defendants disclose and disseminate the material information identified above to Control4 stockholders;

C.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Declaring that defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

E.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  July 2, 2019

WEISSLAW LLP

By _____
Richard A. Acocelli
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010
Email: racocelli@weisslawllp.com

*Attorneys for Plaintiff*